UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>– against –<br><br>TYSHAWN RIVERA,<br><br>                Defendant. | **Statement of Reasons Pursuant to 18 U.S.C. § 3553(2)**<br><br>**16-CR-323-002** |
| UNITED STATES OF AMERICA<br><br>– against –<br><br>MALIK FOLKS,<br><br>                Defendant. | **16-CR-323-005** |
| UNITED STATES OF AMERICA<br><br>– against –<br><br>DYLAN CRUZ,<br><br>                Defendant. | **16-CR-323-004** |

**JACK B. WEINSTEIN, Senior United States District Judge:**

**Parties**

The United States of America

**Appearances**

Andrey Spektor
United States Attorney's Office
271 Cadman Plaza East
Brooklyn, NY 11201
718-254-6475
andrey.spektor@usdoj.gov

David N. Gopstein
United States Attorney's Office
271 Cadman Plaza East
Brooklyn, NY 11201
718-254-6475
david.gopstein@usdoj.gov

Tyshawn Rivera

Peter Quijano
40 Fulton Street, Floor 23
New York, NY 10038
212-686-0666
peter@qandelaw.com

Malik Folks

Michael H. Gold
350 Fifth Avenue, 6800
New York, NY 10118
212-868-0699

Dylan Cruz

Jeremy Schneider
Rothman, Schneider, Soloway & Stern
100 Lafayette Street, Suite 501
New York, NY 10013
212-571-5500
jschneider@rssslaw.com

## Table of Contents

I.    Introduction .................................................................................................... 3

II.    Facts ............................................................................................................. 7

   a.    Events Leading to Arrest ........................................................................ 7

   b.    Tyshawn Rivera's Contact with the Victims' Brother ............................. 8

   c.    Gang Affiliation ..................................................................................... 8

   d.    Arrest of Defendants ............................................................................. 9

     i.    Tyshawn Rivera ................................................................................. 9

     ii.    Malik Folks ..................................................................................... 10

     iii.    Dylan Cruz ..................................................................................... 10

   e.    Guilty Pleas ........................................................................................ 10

   f.    Sentencing .......................................................................................... 10

   g.    Victim Impact Statement ..................................................................... 11

h.  Cypress Hills Houses ........................................................................................ 11

   i.   Jump in Crime and Poverty ...................................................................... 11

   ii.  Cypress Hills Houses Today ..................................................................... 12

   iii. Gangs as a Source of Crime in New York ................................................ 13

   iv.  NYPD and FBI Enforcement Strategy ..................................................... 13

   v.   A City Wide Focus on Gangs and Public Housing ................................... 15

III.  Mandatory Minimum and Criminal History .................................................... 18

IV.  Law ................................................................................................................... 18

   a.  Incapacitation .................................................................................................. 19

      i.   Incapacitation and Incarceration in the United States ............................. 19

      ii.  Incarceration Philosophy Abroad and Proposed for the United States ......... 20

      iii. Evolving Constitutional Framework ........................................................ 21

      iv.  Incapacitation From a Utilitarian Perspective ......................................... 22

   b.  Alternatives to Incarceration in EDNY and Elsewhere ................................. 25

   c.  Gang Programming and Prosecution in New York ........................................ 26

   d.  Mandatory Minimums .................................................................................... 28

V.   18 U.S.C. § 3553(a) Considerations ................................................................ 29

   a.  Tyshawn Rivera .............................................................................................. 30

   b.  Malik Folks .................................................................................................... 31

   c.  Dylan Cruz ..................................................................................................... 32

VI.  Conclusion ....................................................................................................... 33

I.   Introduction

On his twentieth birthday, Malik Folks, along with Tyshawn Rivera and Dylan Cruz, broke into an apartment in Brooklyn, occupied by young children and adults. They terrorized and robbed the family at gunpoint.

Defendants—all adolescents—were gang-members, typically from impoverished and broken families.

They present the court with a number of troubling sentencing issues: (1) the need to prevent future acts of violence by gang members who, because of their home environment, and

past affiliations, may be unable to escape the strictures of gang control; (2) the requirement that a sentencing court consider a defendant's age, potential for rehabilitation, and culpability when crafting a sentence; (3) the limited ability of the justice system to provide the necessary structured environment and programming to prevent recidivism, and properly assist those defendants attempting to overcome poverty, gang allegiances, and a traumatic upbringing; and (4) limited judicial discretion when sentencing pursuant to mandatory minimum statutes.

Statutorily mandated incapacitory sentences are usually unnecessary to increase public safety, or prevent recidivism; they place a tremendous financial burden on society through excessive incarceration.  *See United States v. Dossie*, 851 F. Supp. 2d 478, 478 (E.D.N.Y. 2012) ("[T]oo many . . . defendants . . . 'lose their claim to a future'—to borrow a phrase from Attorney General Eric H. Holder, Jr.—because lengthy mandatory prison terms sweep reasonable, innovative, and promising alternatives to incarceration off the table at sentencing.").

The comparatively lengthy sentences in this case are made necessary by mandatory minimums, but also by the finding that the available alternatives to incarceration or diversion programs are either insufficient or unavailable for violent defendants, like the present ones who have been trapped in a gang culture, and condemned to a life of poverty and probable crime.

New York City currently has a record low homicide rate, not seen since the 1960's, and is the second lowest among major American cities.  Anthony DeStefano, *NYC homicide stats comparable to '60s; other crimes down as well*, Newsday, Jan. 3, 2017 ("New York City finished 2016 tied for its second lowest number of homicides in the modern era of record keeping, driving the city's rate for each 100,000 residents to the lowest level among major U.S. cities except San Diego.").

Praise is due to New York City's police department as well as federal agencies for their concerted efforts to target high crime areas, such as New York City Housing Authority ("NYCHA") complexes, which are often hubs for gang and criminal activity. *See* United States Attorney's Office, EDNY, *Crips Gang Member Indicted For 2014 Murder*, Mar. 7, 2017 (available at https://www.justice.gov/usao-edny/pr/crips-gang-member-indicted-2014-murder) ("The indictment is the result of a long-term investigation initiated by the FBI, the NYPD, and the [United States] Attorney's Office in 2015 in response to gang-related violence in and around Cypress [Hills NYCHA Houses]. The investigation has resulted in charges against 21 defendants for drug trafficking, illegal weapons possession, robbery, and murder.").

Long term extensive investigations, while successful in snaring organized criminals, and credited by many for reducing the city-wide crime rate, have recently come under criticism for taking too wide a sweep in labeling and criminalizing anyone associated or "conspiring" with a gang. One investigation from 2016 culminated with a raid and prosecution described below:

> In total, some 700 officers from an array of local and federal agencies, as well as helicopters and armored vehicles, swarmed the Eastchester Gardens projects and other public housing buildings in this section of the Bronx in the early hours of April 27. Officers from the NYPD gang squad, as well as the Drug Enforcement Administration, Immigration and Customs Enforcement, and the Bureau of Alcohol, Tobacco, Firearms, and Explosives, were targeting two rival gangs. Eighty-eight people were arrested in the blitz, which also led to new, federal charges against several people who were already serving time. In two separate indictments, the defendants, identified by their names and a variety of street names, were charged with racketeering conspiracy, narcotics conspiracy, narcotics distribution, and firearms offenses.
>
> . . . "They're casting far too broad a net," said Babe Howell, a criminal law professor who in 2013 obtained details about 28,000 individuals on an internal NYPD "gang list." "It's a world where there's not enough crime, and there are too many prosecutors and too many resources in law enforcement."

Alice Speri, *In New York Gang Sweeps, Prosecutors Use Conspiracy Laws to Score Easy Convictions*, The Intercept, Jul. 12, 2016 ("Last month, the Mayor's Office of Criminal Justice

announced it would allocate $32 million "in targeted investments that will provide district attorneys with tools to combat the leading drivers of violent crime in each borough."); Edwin Martinez, *Hispanic Leaders Wary of NY Senate Anti-Gang Bill*, May 9, 2017 ("The Senate passed the 'Criminal Street Gang Enforcement and Prevention Act' by 48 votes to 13, to criminalize belonging to a gang, [and] increase penalties for gang-related crimes.").

The Assistant United States Attorney's comments in the instant case reflect common prosecutorial views when dealing with a defendant as a gang member:

> I know in the submission, Mr. Rivera commented that, you know, he's been identified as a gang member but he wasn't ever actually formally brought into the gang and that may be true under these circumstances, however, Your Honor, it's really a distinction without a difference because Mr. Rivera committed this crime with fellow gang members, he was closely associated with gang members, he committed crimes, you know, as a co-conspirator with other gang members and certainly, the victims, when he referenced his guys having seen one of the family members in the neighborhood, they heard loud and clear that the threat was extended across the gang of which he was affiliated. So, he had -- the family member to him, according to the submissions, was, in fact, a leader of the local Crip set in the Cypress Hill Houses. So the authority with which he was speaking as far as the victims heard it and his *association with his co-conspirators is gang-based. So, I think the fear of misconduct in the future is very real.*

Hr'g Tr. 23:14-24:7, Oct. 4, 2017 (emphasis added).

In the present case neither Mr. Rivera, nor his compatriots, were prosecuted under the Criminal Street Gangs Act, 18 U.S.C. § 521(b), which allows for a sentence enhancement of up to ten years, or to a criminal RICO conspiracy pursuant to 18 U.S.C. § 1961. *United States v. Lawrence*, 254 F. Supp. 3d 441, 455 (E.D.N.Y. 2017) ("The Guidelines do not consider gang membership as a factor in sentencing, except for defendants who are sentenced under 18 U.S.C. § 521 . . . where the Guidelines provide for an upward departure.").

Court practice, and the guidelines, fail to provide sentencing alternatives for gang or violent offenders. *See Infra* IV.b. (in the last five years in the Eastern District of New York only

7.4% of participants in alternatives to incarceration programs are defendants charged with violent offenses).

More court sentencing alternatives and community programming, in addition to the NYPD's targeted policing, are necessary to discourage gang violence, as well as to assist defendants attempting to escape their environs after a conviction or sentence. Lengthy mandatory minimums, and the penological theory of incapacitation continue to be justified by a lack of sentencing alternatives for society's "unredeemables." *See e.g.* NYU Center on the Administration of Criminal Law, *Disrupting the Cycle: Reimagining the Prosecutor's Role in Reentry*, (2017) at 36 (discussing the Boston Re-entry Initiative which provides "mentorship, case management, and services to individuals between the ages of seventeen to thirty screened by the Boston Police Department and identified as high risk for continuing involvement in violent crime after release").

II.   Facts

a.   Events Leading to Arrest

On May 14, 2016, Malik Folks, Tyshawn Rivera, Dylan Cruz, Derrick Reed, and Quentin Williams (Mr. Reed and Mr. Williams, fellow conspirators in the break-in, were sentenced separately and had separate statements of reason) robbed a family at gun point, in their apartment, at the Cypress Hills Houses ("Cypress Houses"). Rivera Pre-Sentencing Report ("Rivera PSR") ¶ 5. The defendants chose this location because they believed that one of the victims was running an illegal credit card scheme and would have cash and expensive clothes. *Id.*

Mr. Reed lured a victim out of the apartment under the ruse that he wanted to purchase a fraudulent credit card for $4,000. Rivera PSR ¶ 6. As soon as the door was opened, all five defendants forced their way into the apartment. *Id.*

They separated the nine victims ("four adults and five young children ages seven months to 10 years") into three rooms. *Id.* Stolen was approximately $15,000 in cash, $10,000 in United States Postal Money Orders, clothing, and jewelry. *Id.* Mr. Cruz and Mr. Rivera both held loaded firearms during the robbery. *Id.*

### b. Tyshawn Rivera's Contact with the Victims' Brother

Two days after the robbery, Tyshawn Rivera attempted to intimidate the brother of several of the victims, through Facebook. Rivera PSR ¶ 7. The brother had not been present at the apartment during the robbery. *Id.* Rivera messaged the brother numerous times, threatening him and warning against police cooperation. *Id.*

### c. Gang Affiliation

The United States Attorney's Office ("Government") and the United States Probation Department ("Probation") contend that Mr. Folks, Mr. Reed, Mr. Williams, and Mr. Rivera are members of the "Crips street gang," and that Mr. Cruz is a member of the "Bloods street gang." Rivera PSR ¶ 4. Criminal charges, as already noted, were not brought as part of a RICO conspiracy, nor did the Government seek a Criminal Street Gang sentencing enhancement pursuant to 18 U.S.C. § 521.

Tyshawn Rivera claims that growing up in the Cypress Houses he knew and associated with many gang members, including Crips, but he "was never a member of a gang." Simone Gordon Report ("Gordon Report"), ECF No. 140-1, Aug. 15, 2017. According to Mr. Rivera,

throughout his childhood, the Crips would hang out in the back of the Cypress Houses, and the Bloods controlled the front. *Id.*

The position of the Government was that whether or not he was gang member was "really a distinction without a difference because Mr. Rivera committed this crime with fellow gang members, he was closely associated with gang members, [and] he committed crimes . . . as a co-conspirator with other gang members." Hr'g Tr. 23:17-21, Oct. 4, 2017.

Malik Folks claims that he was not a member of the Crips. Hr'g Tr. 9:16, Oct. 4, 2017. The Government alleges that a tattoo of PTF on Mr. Folks' arm stands for "Protect the Family . . . a local Crips affiliated crew in the Cypress Hills Houses." *Id.* 9:20-23.

Dylan Cruz denies that at the time of the robbery he was a member of the Bloods, but does not contest that he had been affiliated with a street gang in the past. Hr'g Tr. 11:3-8, Oct. 4, 2017. Mr. Cruz's attorney argued that this should not be considered a "gang" case, and that Mr. Cruz was no longer subject to control by any gang:

> This was not a gang turf case. This happened in Cypress. The government is going to deal with the Cypress project and the FBI investigation. My client does not live in Cypress. My client is not a gang member with the co-defendants . . . He is not subject to the rules and regulations of the gang world that [y]our Honor is concerned with anymore.

Hr'g Tr. 17:19-18:12, Oct. 4, 2017.

    d. Arrest of Defendants

        i. Tyshawn Rivera

Tyshawn Rivera was arrested on May 19, 2016, shortly after pictures were posted on Facebook of Mr. Rivera, Mr. Williams, and Mr. Reed wearing clothes stolen from the apartment. Rivera PSR ¶ 14; *see* Trent Clark, *Brooklyn Crips Arrested After Stealing Balmain Jeans & Rocking Them on Facebook*, HipHop DX, May 22, 2016.

ii.   Malik Folks

After learning of Tyshawn Rivera's arrest on May 19, 2016, Malik Folks fled from

Brooklyn; he was eventually apprehended in Albany, New York, on October 14, 2016.  Folks

Pre-Sentencing Report ("Folks PSR") ¶ 7.

iii.   Dylan Cruz

While in custody on Rikers Island for an unrelated pending case in Brooklyn Supreme

Court, Dylan Cruz was arrested for the robbery.  Cruz Pre-Sentencing Report ("Cruz PSR") ¶ 8.

e.   Guilty Pleas

In May of 2017, Mr. Cruz, Mr. Folks, and Mr. Rivera plead guilty to Count three of the

superseding indictment, Brandishing a Firearm in Furtherance of a Crime of Violence.  Cruz

PSR ¶¶ 9, 13, 17.  Each defendant stipulated, but did not plead to, involvement in Counts one

and two, Conspiracy to Commit Hobbs Act Robbery, and Hobbs Act Robbery.  *Id.*

f.   Sentencing

All three defendants were sentenced at separate hearings on October 4, 2017.  Mr.

Rivera's mother, stepfather, stepmother, cousin, and younger brother were present.  Hr'g Tr.

1:15-19, Oct. 4, 2017.  Mr. Folks' brother was present.  Hr'g Tr. 1:14, Oct. 4, 2017.  Mr. Cruz's

two children, and the mother of the children were present.  Hr'g Tr. 2:11-15, Oct. 4, 2017.

The sentencing hearings were videotaped.  *In Re Sentencing*, 219 F.R.D. 262, 264-65

(E.D.N.Y. 2004) ("The sentencing hearing normally requires that the defendant be observed for

credibility, mental astuteness, physical characteristics, ability to withstand the rigors and dangers

of incarceration, and a myriad other relevant factors. In many instances, it is necessary to observe

the employer's and familial ties to the defendant. A judge applies mental impressions of many

tangible and intangible factors when imposing a sentence.").

g.  Victim Impact Statement

A victim impact statement was submitted in writing prior to sentencing; no oral statement was given at the hearing.  *See* Second Addendum to Tyshawn Rivera's PSR Report ("Victim Statement"), Sept. 14, 2017.  The victim summarized the night of the incident and the resulting trauma to herself and her family:

> [T]he defendants . . . entered my home forcefully armed with guns and terrorized myself, [m]y children and my grandchildren. They had no remorse for the fact that there were babies in the home or the fact that I was some ones mother. Their only desire was to take by force the financial and valuable items from my home. They physically assaulted my oldest son and brought instant fear into our world . . . This was a very traumatic incident for myself and my family. I understand these are young men so they're subject to making mistakes that unfortunately they'll have to learn from . . . I don't think I'll ever again feel truly safe.

*Id*.

h.  Cypress Hills Houses

The Cypress Hills Houses sit in the 75th precinct in East New York, Brooklyn.  Typical of many New York City Housing Authority complexes, it is comprised of fifteen seven story buildings in a roughly one-mile radius, housing approximately 3,500 residents.  *See* NYCHA, Cypress Houses (available at https://www1.nyc.gov/assets/nycha/downloads/pdf/cypresshills. pdf).

i.  Jump in Crime and Poverty

Built in 1955, Cypress Houses were originally part of a relatively safe and diverse neighborhood of "African-Americans, Jews, Italian-Americans and Jamaicans."  Emily Brady, *In the Projects, Hope and Hard Knocks*, N.Y. Times, Apr. 13, 2008.  By the 1980's, the area had changed drastically, primarily as a result of "real estate profiteering":

> East New York, long home to factories and laborers, was targeted by speculators known as "blockbusters." They would circulate rumors of black infiltration among working-class white homeowners, inciting panic sales of properties that could then be resold or rented at exorbitant prices to minorities, who had limited

housing options. The public and private sectors aligned in a conspiracy of neglect, and by 1980, the area had lost a third of its population and half of its housing stock to desertion, vandalism, and arson.

Andrew Rice, *The Red Hot Rubble of East New York*, New York Magazine, Jan. 28, 2015.

East New York, and the Cypress Houses then became a hub of criminal, drug, and gang activity. Mary McDonnell, *Former NYC Crack King Reflects on Height of Drug Epidemic*, Daily News, Mar. 4, 2017 ("In East New York's 75th Precinct alone, police investigated 105 murders in 1988, up from 82 in 1987, and 55 in 1986. The number of murders in the precinct peaked at 126 in 1993.").

The dramatic increase in crime and violence was highlighted in 1991 when Mayor David Dinkins, speaking at the Cypress Houses, announced a crackdown on possession of illegal guns in NYCHA housing, and was interrupted by a gun battle over drug turf. James C. McKinley Jr., *Dinkins to Crack Down on Guns in Public Housing*, N.Y. Times, Jun. 21, 1991 ("Hearing shots and ducking for cover, people in the audience said later, is a familiar activity in the Cypress Hills Houses, where a 4-year-old was hit in the leg by a stray bullet early Monday.").

ii. Cypress Hills Houses Today

Crime across New York City and in the 75th precinct has dropped sharply. A NYPD CompStat report for the 75th precinct produced on November 5, 2017, showed a 91.6% reduction in murders from 1993. *See* CompStat Report, Nov. 5, 2017 (available at https://www1.nyc.gov/assets/nypd/downloads/pdf/crime_statistics/cs-en-us-075pct.pdf). New York City as a whole, had fewer than 1,100 reported shootings in 2016, the lowest number in over two decades. Ashley Southall, *Shootings in New York Fall to Lowest Number Since the 90's*, N.Y. Times, Jun. 4, 2017.

Still, the 75th precinct led New York City with 23 murders in 2016 (down from 126 in

1993). *See* Seven Major Felony Offenses by Precinct, 2016 (available at

http://www1.nyc.gov/assets/nypd/downloads /pdf/analysis_and_planning/seven-major-felony-

offenses-by-precinct-2000-2016.pdf).

iii.   Gangs as a Source of Crime in New York

The drop in crime and murder rate, as well as the NYPD and prosecutorial focus on

gangs, appear to make the correlation between gang activity and crime obvious, but some argue

that this assumption is overstated:

> The New York City Police Department (NYPD) is about to follow a number of
> other urban police departments down the well-worn path of gang policing. It does
> not take this path because New York City has a significant gang problem. Gangs
> ranked last and second-to-last among the causes of murder in the two years since
> the NYPD added the category of "gangs" as a cause of murder to its annual
> reports. Nor do gang-motivated crimes account for even one percent of the crimes
> that take place in New York City each year. Indeed, having recently transferred
> 300 new officers to the Gang Division, the NYPD has more new police officers in
> the Gang Division than the 264 gang-motivated crimes the NYPD identified in the
> 2013 fiscal year.

K. Babe Howell, *Gang Policing: The Post Stop-and-Frisk Justification for Profile-Based*

*Policing,* 5 U. Denv. Crim. L. Rev. 1, 2 (2015) (internal citations omitted).

iv.   NYPD and FBI Enforcement Strategy

As stated in the Government's pre-sentence letter, "[t]his case was brought in the context

of a long term investigation by the FBI and the New York City Police Department [] into the

relentless crime and violence plaguing the residents of Cypress, which is a 1,400 apartment

housing development."  U.S. Attorney Pre-Sentence Letter, at 2 ("U.S. Letter").  The

Government alleges that this violence is driven by "a deadly gang turf war" fought over

"narcotics-trafficking" operations. *Id.*  The investigation has prioritized stopping "the flow of

firearms" into the hands of Cypress Hills' "young men who continue to commit violent crimes such as the armed robbery in this case." *Id.*

In other recent cases, the United States Attorney for the Eastern District of New York has commented on the concerted effort to stem gang violence and the flow of guns and drugs at Cypress Houses:

> This indictment sends a message to all gang members in the Cypress Hills Houses and beyond – we will be relentless in our pursuit of violent gang members who have besieged communities like Cypress for far too long . . . My Office, along with our federal partners and the NYPD are committed to reducing shootings and saving lives through a coordinated effort to target the most violent offenders who are doing harm in our communities.

United States Attorney's Office, EDNY, *Crips Gang Member Indicted For 2014 Murder*, Mar. 7, 2017 (available at https://www.justice.gov/usao-edny/pr/crips-gang-member-indicted-2014-murder);  Andrew Keshner, *Alleged Brooklyn Gang Member, 23, Federally Indicted for 'Cold-Blooded Execution' of Rival,* N.Y. Daily News, Mar. 7, 2017 ("In court papers, prosecutors said Facebook, Youtube, wiretaps and other evidence showed Bannister's status in the violent gang, which carried out robberies and drug trafficking. Law enforcement has been looking into violence at the 1,400 apartment public housing complex at the Cypress Hills Houses. Brooklyn federal prosecutors have filed charges against 20 others so far.").

Another investigation at the Cypress Houses targeted illegal credit card schemes.  United States Attorney's Office, EDNY, *Fourteen Defendants Charged With Drug Trafficking and Illegal Weapons Possession in the Cypress Hills Houses in Brooklyn*, Jun. 7, 2016 (available at https://www.justice.gov/usao-edny/pr/fourteen-defendants-charged-drug-trafficking-and-illegal-weapons-possession-cypress) ("On May 3, 2016, pursuant to a lawfully-authorized search warrant, the FBI seized and searched a Fed-Ex package that one defendant attempted to ship to a

co-conspirator in Georgia containing more than 1,300 fraudulently manufactured credit cards that bore no name or stored information.").

The Office of the Special Narcotics Prosecutor for the City of New York has been heavily involved in drug and gang related investigations at the Cypress Houses.  Special Narcotics Prosecutor, *Drug Trafficking Ring Dismantled in Brooklyn's Cypress Hills Houses: 32 Charged*, Aug. 14, 2012 (available at http://www.snpnyc.org/wpcontent/uploads/2016/05/cypress.pdf) ("More than a dozen shootings, including two homicides, have taken place in the vicinity of the Cypress Hills Houses since November 2010. The violence stems from a dispute between Blood and Crip-related crews. Police are continuing to investigate whether several of the defendants charged in the narcotics investigation are involved in the gangs. Between December 7, 2011 and July 18, 2012, undercover NYPD officers purchased narcotics on 27 occasions inside the lobbies, hallways, stairwells and elevators of the housing complex. The sales ranged from $20 to $110 each and involved primarily crack-cocaine and heroin, as well as two sales of powder cocaine.").

Large-scale investigations with a focus on gangs and drugs, are nothing new in New York City or Cypress Hills, and have been advertised as a crime fighting tactic for decades. Erika Martinez, *Cops End Reign of Drug Gangs: Cypress Hills Hoods Bawl Like Babies As Neighbors Rejoice*, New York Post, Sept. 26, 2002 ("From Sept. 18 through yesterday, the [narcotics officers] swooped down and arrested 45 members of five gangs, which controlled the Cypress Hills housing project in East New York.  Police Commissioner [Raymond] Kelly and Brooklyn DA Charles Hynes said the gangs worked out a plan in 1997 to divvy up the massive complex.").

     v.  A City Wide Focus on Gangs and Public Housing

Police raids swarming NYCHA housing projects resulting in conspiracy charges, after

long-term investigations, are increasingly common throughout the city:

> The early-morning arrests were the latest in a strategy honed by the district
> attorney and the Police Department in recent years to create complex conspiracy
> cases out of retribution murders and shootings, wrapping up dozens of gunmen
> and their associates at once. Similar operations aimed at gangs in East Harlem, the
> Bronx and Brooklyn have been followed by drops in the number of shootings and
> killings in pockets that had been plagued by violence.
>
> Mr. Bratton [New York City police commissioner] has heralded the approach,
> begun under his predecessor, Raymond W. Kelly, promising to extend it to more
> areas of crime. In a joint interview on Monday with Mr. Vance [Manhattan
> District Attorney], Mr. Bratton said that the strategy could be particularly
> effective in attacking networks of thieves and fences that facilitate thefts of
> electronic devices like iPhones or engage in identity theft.

J. David Goodman, *Dozens of Gang Suspects Held in Raids in Manhattan*, N.Y. Times, Jun. 4,

2014.  Most of these raids and prosecutions come after protracted tracking by the FBI or NYPD.

Joe Coscarelli, *Bronx Gang Busted Discussing Crimes on Facebook and Instagram*, New York

Magazine, Dec. 6, 2012 ("After stepping up its Facebook presence, the NYPD arrested 49

alleged Brooklyn gang members with the help of their online antics in September.").

City officials have credited the drop in violent crime to the Police Department's focus on

gang arrests and prosecutions:

> After restructuring its investigative units, the department carried out 107 targeted
> arrests that rounded up more than 1,000 suspected gang members, drug traffickers
> and their associates.
>
> Many of the suspects were indicted before they were arrested, and *they are
> receiving longer sentences when convicted*, Commissioner O'Neill said.
>
> "We're picking them off one by one, or in many cases, dozens by dozens," said
> Commissioner O'Neill, who succeeded William J. Bratton in the fall.

Ashley Southall, *Shootings in New York Fall to Lowest Number Since the '90s*, N.Y. Times, Jan.

4, 2017 (emphasis added).

NYCHA residents who are subjected to these raids, while happy with the reduction in crime, are not always pleased with side effects:

> "As a NYCHA resident, I don't want helicopters and tanks in my community to get the drug dealers out," a woman said at a recent meeting, referring to the New York City Housing Authority, the agency overseeing public housing. Someone else in attendance called the raids "social cleansing of the projects."
>
> After the Eastchester Gardens raid, many families whose sons had been arrested received letters notifying them that NYCHA had initiated termination proceedings against them. Mattison said she had been late on rent, but that housing officials told her she had broken the lease by letting one of her sons and her granddaughter's father stay at her apartment without declaring it. Because they were now caught up in a federal case, she said they told her, the whole family had to go. A spokesperson for NYCHA told *The Intercept* that when the agency learns of the arrest of an individual with connections to public housing, it opens a "rigorous and comprehensive investigation." In the Eastchester Gardens case, officials identified 16 individuals named in the indictment with connections to tenants, leading to two permanent exclusions — an option given to family members to save the tenancy. "The remaining cases are ongoing. "The safety of our residents is NYCHA's top priority," the spokesperson wrote in an email. "The authority continues to partner closely with the NYPD and others to address neighborhood public safety challenges."

Alice Speri, *In New York Gang Sweeps, Prosecutors Use Conspiracy Laws to Score Easy Convictions*, The Intercept, Jul. 12, 2016.

Many family members and friends of those caught in the "conspiracies" wish that the police would intervene earlier when monitoring behavior on social media, and argue that too many kids are labeled guilty or gang members merely because of where they live:

> When you talk to families in Grant and Manhattanville, they don't describe themselves as people who were enlisted in a war against violence; they describe themselves as targets of an assault by the cops. Yes there were a handful of hotheads causing problems, says [the mother of one defendant]. But the Operation Crew Cut raid ripped a hole in the neighborhood. Far too many of the defendants, she says, are being punished for little more than posting on Facebook or associating with people they've known all their lives.
>
> "It's not a gang," she said. "These kids grew up together. They all went to the same schools; they knew each other since they were in Pampers. How can you not hang out with each other?"

Abigail Kramer, *Busts, but not a solution, from NYPD tracking of housing feuds*, POLITICO, Mar. 2, 2015; Josmar Trujillo, *Gangs of New York?*, Huffington Post, Mar. 1, 2017 ("You are in a gang, according the NYPD's Intelligence Division, if you fit one of three sets of criteria. One, you admit to being in a gang. Two, you're identified as a gang member by other agencies, like the Department of Corrections. Three, any two of the following apply to you: having scars or tattoos cops say are gang-related, wearing colors or using signs associated with gangs, associating with gang members or living in a designated gang area. This flexible definition puts into focus claims over the past few years that people are being caught in a gang dragnet unfairly."); Jeff Mays, *District Attorney Casts Too Wide a Net in Harlem Gang Crackdown, Critics Say*, DNAinfo, Oct. 6, 2014 ("[The defendant's mother] is just one of many critics who question prosecutors' strategy of using conspiracy charges to dismantle youth crews, which some say is a heavy-handed tactic that unfairly sweeps too many young black and Latino men into the criminal justice system.").

III.    Mandatory Minimum and Criminal History

Pursuant to 18 U.S.C. § 924(c)(1)(A)(i)-(ii), Brandishing a Firearm in Commission of a Violent Offense, the guideline sentence is the mandatory minimum required by statute—eighty-four months prison.

Tyshawn Rivera and Malik Folks have no prior criminal record.  Rivera PSR ¶ 42; Folks PSR ¶ 40.  Dylan Cruz has a prior conviction for Attempted Criminal Possession of a Weapon, a class D felony, as well as a number of convictions for minor offenses, giving him a criminal history category of V.  Cruz PSR ¶ 49.

IV.    Law

In designing a sentence, a court considers the "goals of penal sanctions that have been recognized as legitimate—retribution, deterrence, incapacitation, and rehabilitation." *Graham v. Florida*, 560 U.S. 48, 71 (2010) (citing *Ewing v. California*, 538 U.S. 11, 25 (2003)) (plurality opinion).

    a.   Incapacitation

The penological goal of incapacitation is justified by the theory that society will no longer suffer from offenders who are "rendered physically incapable of committing crime." Arthur W. Campbell, *Law of Sentencing*, at 42 (3d ed. 2004). As Campbell notes the means of incapacitation have changed dramatically over time:

> Historically, methods of incapacitation included severing hands from pick-pockets, genitals from sex-offenders, and heads from murderers. Today, under various labels, incapacitation is argued to support sentencing measures that range from closely supervised probation at one extreme to death sentences at the other.

*Id.*

    i.   Incapacitation and Incarceration in the United States

Under the United States penitentiary system, rehabilitation was traditionally the primary purpose of incarceration, with incapacitation reserved for "incorrigibly dangerous offenders." Guyora Binder & Ben Notterman, *Penal Incapacitation: A Situationist Critique*, 54 Am. Crim. L. Rev. 1, 5 (2016).

A shift in sentencing ideology began in the mid twentieth century when an uptick in crime accompanied by racial upheaval led to a distrust of rehabilitative programs and a focus on incarceration:

> [The] prevalent image of the intractable offender was inflected with racial connotations. Rising crime rates coincided with urban riots and disputes over school desegregation during the 1960s and 1970s to make crime policy a context for racial demagoguery. Richard Nixon, George Wallace, and Ronald Reagan made coded appeals to White resentment by identifying themselves with "law and

order" or referring to city streets as dangerous "jungles." Anti-crime rhetoric also
attacked judges as indifferent to crime victims. The Supreme Court, already under
attack for mandating school desegregation, made itself a target of anti-crime
rhetoric by expanding constitutional safeguards in criminal procedure and
restricting the death penalty. Critiques of judicial discretion motivated calls for
uniform, determinate sentencing, culminating in the 1987 Federal Sentencing
Guidelines and guideline schemes in about half the states. Parole and probation
were increasingly portrayed as a revolving door, releasing incorrigibly violent
offenders to prey on the public. The 1988 presidential campaign revealed the
political potency of this narrative, as ads for George Bush held Michael Dukakis
responsible for a violent crime committed by a furloughed black prisoner named
Willie Horton and showed prisoners exiting a revolving door. California's 1994
"Three Strikes" law was propelled by public outrage over another violent crime
by a parolee.

*Id.* at 6 (internal citations omitted).

This increased focused on incapacitation led to a rapid increase in prison population and
rising state and federal corrections expenditures, while failing to address recidivism. *Sentencing
and Prison Practices in Germany and the Netherlands: Implications for the United States*, Vera
Institute of Justice, Oct. 2013 at 3-5 ("The overall imprisonment rate in the United States,
including jail and federal population, is 716 per 100,000 residents. The comparison to European
rates is startling: 79 per 100,000 residents in Germany and 82 per 100,000 residents in the
Netherlands are in prison.").

Today, incapacitation remains a primary focus of courts in sentencing, especially for
violent crimes.

The most compelling justification for incarceration in this case is that it will
prevent defendants from committing further crimes while they are in prison.
Excepting the possibility of organizing crimes outside the prison walls via cellular
phone, incarcerated criminals can do little direct harm to the [non-incarcerated]
public. The hope—and experience—is that as they grow older they become less
violent.

*United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011).

ii. Incarceration Philosophy Abroad and Proposed for the United States

In Germany and the Netherlands, the large difference in incarceration rates mainly stem

from a focus on "resocialization and rehabilitation."  As stated in the Vera Institute's study:

> According to Germany's Prison Act, the sole aim of incarceration is to enable
> prisoners to lead a life of social responsibility free of crime upon release,
> requiring that prison life be as similar as possible to life in the community
> (sometimes referred to as "the principle of normalization") and organized in such
> a way as to facilitate reintegration into society. The German Federal
> Constitutional Court stated that the protection of the public is not an "aim" of
> confinement in and of itself, but a "self evident" task of any system of
> confinement—a task that is resolved best by an offender's successful re-
> integration into society. Similarly, the core aim of the Netherlands 1998
> Penitentiary Principles Act is the re-socialization of prisoners in which
> incarceration is carried out with as few restrictions as possible through the
> principle of association (both within prison and between prisoners and the
> community), and not separation. Thus, prisoners are encouraged to maintain and
> cultivate relationships with others both within and outside the prison walls.

*Sentencing and Prison Practices*, *supra*, at 7.  These factors are increasingly being encouraged in

the United States.  *See e.g.* NYU Center on the Administration of Criminal Law, *Disrupting the

Cycle: Reimagining the Prosecutor's Role in Reentry*, (2017); Restatement of Sentencing § 6

(Am. Law Inst. 2017).

### iii.  Evolving Constitutional Framework

In *Ewing v. California*, 538 U.S. 11, 30-31 (2003), the Supreme Court held that a

sentence of twenty-five years to life for stealing three golf clubs valued at $399, felony grand

theft, and the defendant's third felony under California's three strikes law, did not violate the

Eighth Amendment because it was justified by the penological theory of incapacitation.  *See*

Binder, *supra*, at 18 ("In *Ewing*, however, the Court ignored culpability, and reasoned that

sentences of incarceration need not serve the penal purposes of retribution or deterrence.

Instead, the Court held that punishment is proportional if there is a 'reasonable basis for

believing that it advances any of the traditional justifications for punishment—retribution,

rehabilitation, deterrence, or incapacitation.'")  The Court ruled that a state legislature has the

constitutional authority to make a "judgment that protecting the public safety requires incapacitating criminals who have already been convicted of at least one crime." *Ewing*, 538 U.S. at 25.

Less than a decade later the Supreme Court held in *Graham v. Florida*, 560 U.S. 48 (2010) and *Miller v. Alabama*, 567 U.S. 460 (2012), that a sentence must be proportional to the severity of the crime and the culpability of the actor. Incapacitation cannot be the sole purpose of a sentence:

> When assessing whether sentencing juveniles to life without parole for non-homicide crimes served any legitimate purpose, the Court was moved by empirical evidence distinguishing juvenile and adult minds. Whether this preference for empirical evidence will become a lasting feature of proportionality jurisprudence is one of *Graham*'s many unanswered questions. What does seem clear is that *Graham* restored retribution as a limitation on noncapital sentencing; a sentencing practice that improves public safety may nonetheless be struck down as excessive in relation to that deserved for the offense or necessary to deter it.
>
> "Incapacitation," Justice Kennedy explained, "cannot override all other considerations, lest the Eighth Amendment's rule against disproportionate sentences be a nullity." More recently, *Miller v. Alabama* held that the Eighth Amendment prohibits mandatory sentences of life without parole for juveniles, even for homicide. *Miller* combined *Graham*'s "categorical" analysis with an individualized assessment of culpability that would account for a defendant's age and "environmental vulnerabilities." Emphasizing that "[a]n ever-growing body of research in developmental psychology and neuroscience" supported the distinction between juvenile and adult offenders, the Court again refused to credit the assumption that certain offenders are irretrievably depraved by virtue of the type of crime they committed. Applying the framework of *Graham* and *Miller* to recidivist statutes requires more rigorous examination of incapacitation's theoretical and empirical assumptions.

Guyora Binder & Ben Notterman, *Penal Incapacitation: A Situationist Critique*, 54 Am. Crim. L. Rev. 1, 19 (2016) (internal citations omitted).

iv.   Incapacitation From a Utilitarian Perspective

The theory of incapacitation presupposes that: (1) we are made safer, in the short and long term, when individuals are removed from society; and (2) the costs to society and the individual are more than balanced by increased safety.

One problem with this theory, is that studies show that recidivism rates increase with lengthier prison sentences.  As stated in the Sentencing Project's Report:

> A series of studies have examined the public safety effects of imposing longer periods of imprisonment. Ideally, from a deterrence perspective, the more severe the imposed sentence, the less likely offenders should be to re-offend. A 1999 study tested this assumption in a meta-analysis reviewing 50 studies dating back to 1958 involving a total of 336,052 offenders with various offenses and criminal histories. Controlling for risk factors such as criminal history and substance abuse, the authors assessed the relationship between length of time in prison and recidivism, and found that longer prison sentences were associated with a three percent increase in recidivism. Offenders who spent an average of 30 months in prison had a recidivism rate of 29%, compared to a 26% rate among prisoners serving an average sentence of 12.9 months.  The authors also assessed the impact of serving a prison sentence versus receiving a community-based sanction. Similarly, being incarcerated versus remaining in the community was associated with a seven percent increase in recidivism.

Valerie Wright, Ph. D., *Deterrence in Criminal Justice*, The Sentencing Project, Nov. 2010, at 6 (internal citations omitted).  There is a self-selective factor in these statistics since those given heavier sentences will tend to be seen by the sentencing judge as more dangerous.

An argument may also be made that removing individuals from society does not decrease crime, even in the short term, because:

> replacement [of "incapacitated" offenders is] likely insofar as crimes are committed by organizations operating in illicit markets. These crimes occur regardless of whether one individual is incarcerated. Moreover, in a market catering to addictive preferences, in which demand may not decline with higher prices, competing organizations may absorb the "displaced" transactions previously belonging to other organizations . . . But more significantly, the assumption that only black-market transactions are subject to replacement effects is baseless. Recall that predatory crimes like burglary and robbery are often committed by groups, because there is strength in numbers, and because peer

> pressure can overcome moral inhibition and fear. Yet the feasibility and
> probability of a group offense are not necessarily affected by the removal of one
> member, who may be replaced in any case. While the political rhetoric of the war
> on crime may promote images of sadistically motivated offenders, most crime is
> committed to obtain social or economic resources not available through more
> conventional channels.

Binder, *supra*, at 20–21; *see also U.S. v. Bannister*, 786 F. Supp. 2d 617, 668-69 (E.D.N.Y.

2011) ("There is little evidence, however, that incapacitating the members of the modest-sized

drug organization described in the instant case will cause a net decrease in crime. The sentences

in this case will not suppress the demand for crack and heroin, nor are they likely to work any

meaningful effect on the price or supply of drugs sold by other organizations near Louis

Armstrong Houses.").

A concern is the fiscal implications present in lengthy prison sentences, which weigh

heavily in favor of limiting incapacitation.  Valerie Wright, Ph. D., *Deterrence in Criminal*

*Justice*, The Sentencing Project, Nov. 2010, at 7 ("It is estimated that federal, state, and local

governments are spending $68 billion annually. A recent economic analysis estimates that

reducing the number of incarcerated non-violent offenders by half could save taxpayers $16.9

billion annually without putting public safety at [greater] risk. Non-violent drug offenders

comprise a substantial percentage of the prison population and many studies have suggested that

this number could be reduced if more treatment alternatives were available. While there are costs

associated with treatment, research indicates that they tend to be far lower than the costs

associated with lengthy terms of incarceration that show little evidence of deterring future

offenses.").

Critics of incapacitation argue that it should be limited to the most violent offenders, and

even then, should be used only in accordance with predictive models that prove the effectiveness

of the sentence.  Arthur W. Campbell, *Law of Sentencing*, at 43-44 (3d ed. 2004) ("Even today,

where some still urge prison sentences that incapacitate, the most efficient use is to restrict this rational to justifying imprisonment for only the most dangerous offenders, and recognize the need for more accurate presentence studies to diagnose those types.").

     b.  Alternatives to Incarceration in EDNY and Elsewhere

The Eastern District of New York has some of the most expansive and productive alternatives to incarceration and pretrial diversion programs in the country. *See Alternatives to Incarceration in the Eastern District of New York*, Third Report to the Board of Judges, EDNY, Oct. 2017. These programs focus predominantly on youthful offenders and non-violent defendants with substance abuse issues. *Id.* at 1. The current cost savings of these programs, calculated from the expected prison term for each defendant, is estimated at $5.8 million. *Id.* at 24.

Eastern District programs tend not to accept, the Government typically does not recommend, and mandatory minimum sentences do not allow, participants charged with violent crimes. In the last five years only 7.4% of participants in the Eastern District alternatives to incarceration programs are defendants charged with violent offenses. *Id.* at 21. Thus, even youthful offenders, charged with violent offenses, are typically not given the opportunity to avoid incarceration or participate in programming that would enhance their skills and reduce recidivism.

For violent offenders, the focus on incapacitation, and away from diversion, probation, or intense supervised release, stands in stark contrast to many European countries.

> In Germany and the Netherlands, incarceration is used less frequently and for shorter periods of time. Both countries rely heavily on non-custodial sanctions and diversion, and only a small percentage of convicted offenders are sentenced to prison—approximately six percent in Germany and 10 percent in the Netherlands. In most cases—even for relatively serious crimes such as burglary, aggravated assault, or other crimes considered felonies in the United States—

25

>prosecutors divert offenders away from prosecution or judges sanction offenders with fines, suspended sentences, or community service. In both the Netherlands and Germany, fines are used extensively as a primary sanction . . . In contrast, because incapacitation and retribution are primary goals of sentencing in the U.S., incarceration is used frequently and for longer periods of time. In 2010, 70 percent of convicted offenders in the U.S. received a sentence that included a prison term, while only 30 percent received a probationary sentence.

Wright*, supra*, at 9 (internal citation omitted); *see also supra* Part IV.a.ii.

Programming directed at gang involved, or violent criminals, has seen success in other jurisdictions in the United States.

>The Boston Reentry Initiative (BRI) provided mentorship, case management, and services to individuals between the ages of seventeen to thirty screened by the Boston Police Department and identified as high risk for continuing involvement in violent crime after release. Program selection recommendations were based on factors including gang membership, criminal history, likelihood to recidivate, and an expectation that the individual would return to a high-crime community. Screened individuals were required to attend a BRI panel session within forty-five days of entering prison, where they received information about the program and heard from prosecution, probation, and parole departments about the consequences of rearrest after release . . . Participants were assigned a case manager and developed a "transitional accountability plan" to coordinate services to an individual's needs, which addressed issues like obtaining drivers' licenses or identification, health insurance, transportation, and interim jobs, as well as drug and behavioral health treatment, education, and permanent housing. "On the day of release, the facility arranged for either a family member or a case manager to meet the individual at the door." Case management continued for up to eighteen months after release. The Suffolk County District Attorney's Office and the U.S. Attorney's Office were both program partners. The program was successful in reducing recidivism among this high-risk group.

NYU Center on the Administration of Criminal Law, *Disrupting the Cycle: Reimagining the Prosecutor's Role in Reentry*, (2017) at 36.

>c.   Gang Programming and Prosecution in New York

While New York City does have many violence and gang specific programs, they primarily focus on prevention or intervention.  *See e.g.*, Gang Diversion, Reentry And Absent Fathers Intervention Centers ("GRAAFICS") (available at http://www.graafics.org/)

("[GRAAFICS] assist[s] active gang members, inactive gang members, the incarcerated, the formerly incarcerated and absent fathers with successfully reforming attitudes and behaviors that directly contribute to unhealthy decision making."); NYC Department of Education, Gang Prevention and Intervention (available at http://schools.nyc.gov/StudentSupport/NonAcademic Support/GangPrevention/default.htm) ("The Gang Prevention & Intervention Unit (GPIU) located within the Office of Safety and Youth Development (OSYD) works to promote student safety and awareness in regards to youth and gang violence and other unlawful behavior."); Cure Violence (available at http://cureviolence. org/the-model/essential-elements/) ("Trained violence interrupters and outreach workers prevent shootings by identifying and mediating potentially lethal conflicts in the community.").

In line with traditional theories of incapacitation, and even with crime in New York state at an all-time low, the New York Senate recently passed the "Criminal Street Gang Enforcement and Prevention Act" to enhance gang prosecution and stem gang violence requiring higher incapacitation.

> Senator Elaine Phillips (R-C, Manhasset), cosponsor of the legislation, said, "Gangs are brutally and mercilessly preying on people across New York State, and they must be stopped. No community should ever have to fear horrific acts of violence like those which took place on Long Island. This legislation is an aggressive, comprehensive approach that will *help put violent gang members behind bars and keep children from joining these gangs in the first place.* The Assembly should join the Senate in acting on this legislation and providing these new tools to protect our communities."

> For the first time ever, the legislation legally defines criminal street gangs in New York's penal statutes, giving prosecutors more options when charging offenders. Classifying and identifying this type of criminal activity will also help law enforcement better track gangs. Penalties are increased and new felonies are created for individuals who benefit from gang activity, participate in gang activity, and recruit youth or adults to participate in gang activities.

27

New York State Senate, *Combating Gang Violence*, May 8, 2017 (available at

https://www.nysenate.gov/newsroom/press-releases/senate-passes-comprehensive-

legislation-crack-down-rise-gang-violence-new) (emphasis added).

    d.  Mandatory Minimums

    Mandatory minimum sentences are the greatest byproduct of the penological focus on

incapacitation.

> Since 1991, the number of criminal statutes that have mandatory minimum
> sentences has increased by more than 78%. There are now over 170 provisions
> that bear mandatory minimum sentences. Twenty-eight percent of the federal
> criminal cases subject to the sentencing guidelines in 2009 involved statutes that
> carried mandatory minimums. That figure increases to 40% of the docket if
> immigration cases are excluded. The impact of mandatory minimums is further
> exacerbated by the Commission's decision to tie the guidelines to mandatory
> minimum sentences and Congress's directive in the PROTECT Act to require the
> Commission to adopt guidelines that are "consistent with all pertinent provisions
> of any Federal statute . . . ." In practice, the Commission has increased guidelines
> penalties each time a new mandatory minimum sentence is passed by Congress.
> As a result, penalties have increased significantly over time, resulting in a
> dramatic increase in the federal prison population.

William K. Sessions III, *At the Crossroads of the Three Branches: The U.S. Sentencing

Commission's Attempts to Achieve Sentencing Reform in the Midst of Inter-Branch Power

Struggles*, 26 J.L. & Pol. 305, 331–32 (2011) (internal citations omitted).

    Mandatory minimums eliminate the ability of judges to take into account the full range of

sentencing considerations under 18 U.S.C. 3553, and deny defendants' the opportunity to benefit

from alternatives to incarceration.  *United States v. Dossie*, 851 F. Supp. 2d 478, 478 (E.D.N.Y.

2012 ("[Mandatory minimums] strip criminal defendants of the due process rights we consider

fundamental to our justice system.").

    Some states have introduced significant sentencing reforms to reduce unnecessary

incapacitory sentences.

> Concerns about strained state budgets and prison overcrowding have prompted lawmakers to reconsider lengthy incarceration as the preferred response to crime. Some reforms are designed to eliminate or shorten sentences, often by increasing judicial discretion. Between 2000 and 2002, more than two dozen states implemented sentencing reforms, "eliminating mandatory minimums, accelerating parole, or expanding [prison] alternatives like drug treatment."

*United States v. Bannister*, 786 F. Supp. 2d 617, 655 (E.D.N.Y. 2011) (internal citations omitted).

The federal system has repealed some mandatory minimums for drug crimes, and the United States Sentencing Commission has recommended further reductions in mandatory minimums and greater discretion for judges.

> Members of Congress have introduced numerous pieces of bipartisan legislation proposing various sentencing changes (many of which reflect recommendations made by the Commission in its 2011 *Mandatory Minimum Report*), including:
>
> - reducing mandatory minimum penalties for certain drug offenses;
> - broadening the existing "safety valve" to include offenders with prior misdemeanor convictions, while excluding offenders with prior felony convictions, or prior violent or drug trafficking convictions;
> - creating a second "safety valve" allowing judges to sentence certain low-level offenders below an otherwise applicable ten-year mandatory minimum penalty;
> - revising the mandatory minimum penalties for firearms offenses, including changes to section 924(c) and the Armed Career Criminal Act; and
> - making the statutory changes in the Fair Sentencing Act of 2010 retroactive.

United States Sentencing Commission, *Overview of Mandatory Minimum Penalties in the Federal Criminal Justice System (2017),* at 22-23; *see also Dossie*, 851 F. Supp. at 482 ("The Sentencing Commission has recommended that Congress 'consider marginally expanding the safety valve at 18 U.S.C. § 3553(f) to include certain non-violent offenders who receive two, or perhaps three, criminal history points.' . . . This recommendation is too tepid, given how easy it is for nonviolent offenders to rack up criminal history points, especially while under supervision, *see* U.S.S.G. § 4A1.1(d).").

V.    18 U.S.C. § 3553(a) Considerations

Under 18 U.S.C. § 3553(a) the court is instructed to consider the traditional sentencing factors of retribution, deterrence, incapacitation, and rehabilitation, as well as the "nature of the offense," and the "characteristics of the defendant."

A detailed statement of reasons is important for appellate review, as well as to improve the sentencing process.

> [A] system in which sentencing judges are required to provide more detailed explanations for their decisions could have benefits including reducing judges' cognitive biases toward following the Sentencing Guidelines without further consideration, communicating respect for defendants and their participation in the criminal justice process, and contributing to the improvement of the Guidelines in the future. Models for such a raised standard of judicial explanation exist already: for example, in American immigration courts and in criminal courts in most of continental Europe.

*Due Process Clause-Federal Sentencing Guidelines- Beckles v. United States*, 131 Harv. L. Rev. 302 (2017).

   a.   Tyshawn Rivera

Tyshawn Rivera is sentenced to ninety months prison, six months over the mandatory minimum, and five years post-release supervision.  Hr'g Tr. 28:16, Oct. 4, 2017.

At the time of robbery Mr. Rivera was nineteen years old.  Rivera PSR ¶ 53.

He was raised by his mother who supported him, and his five maternal siblings, largely through public assistance.  Rivera PSR ¶ 53.  The family moved in and out of shelters, and his grandmother's apartment at Cypress Houses.  Rivera PSR ¶ 58.  After his eighteenth birthday, Mr. Rivera was excluded from his grandmother's apartment, and began to live with friends, or wherever he could sleep for the night.  Defendant's Sentencing Report ("Sentencing Report"), ECF No. 140, Aug. 15, 2017, at 2.  He dropped out of high school halfway through twelfth grade.  *Id.*

Dr. Sanford Drob, Ph.D., a clinical psychologist, conducted a Forensic Psychological Evaluation of Mr. Rivera as part of the defendant's sentencing report. Dr. Drob diagnosed him as having a number of mental health issues, including Post Traumatic Stress Disorder. Sentencing Report, at 4.

Tyshawn Rivera's youth, upbringing, and mental health status serve as mitigating factors for sentencing, but the court must consider the seriousness of the crime itself, his central role in it, and the likelihood that without significant structure and support—that the court is unable to provide—he will continue to commit violent criminal acts.

During the robbery, Mr. Rivera possessed and brandished a firearm. Rivera PSR ¶ 6. After the robbery he sent the victims threatening messages via facebook, in an attempt to dissuade them from cooperation with the police. Rivera PSR ¶ 7. Mr. Rivera also has ties to the Crips street gang, which are important in evaluating his potential for rehabilitation, possible recidivism, and future danger to the community.

b. Malik Folks

Malik Folks is sentenced to the mandatory minimum, eighty-four months custody. Hr'g Tr. 18:10, Oct. 4, 2017. Mr. Folks committed the robbery on May 14, 2016, his twentieth birthday. Folks PSR ¶ 46.

Mr. Folks was raised by his mother, a New York State Corrections Officer, who died in 2014 from cervical cancer. Folks PSR ¶ 46. After the death of his mother, Mr. Folks became homeless, and resided with his friends, or his brother, Tyqwan Folks. Folks PSR ¶ 48. Tyqwan Folks works for the U.S. Postal Service and will assist his brother with re-entry and housing when he is released. Folks PSR ¶ 48.

Mr. Folks did not possess a firearm during the robbery, but he was aware that his co-defendants possessed guns and were planning to "brandish" them.  Folks PSR ¶ 5.  Mr. Folks has no criminal record.

The Government alleges with considerable force that Mr. Folks is a member of the Crips street gang based on his gang-related tattoos.

Brandishing a firearm during a crime of violence is serious offense that requires a consideration of incapacitation.  Eighty-four months custody is sufficient to prevent and deter future criminal acts.  Mr. Folks has significant potential for rehabilitation and a greater sentence would increase the likelihood of recidivism.

c.    Dylan Cruz

Dylan Cruz is sentenced to ninety-six months incarceration and five years post-release supervision.  Hr'g Tr. 7:7-10, Oct. 4, 2017.

Mr. Cruz was twenty-four years old at the time of the robbery.  Cruz PSR ¶ 55.

Dylan Cruz's mother was in foster care when he was born, and he was raised by her foster parents in Ozone Park, Queens.  Cruz PSR ¶ 57.  He moved back in with his mother at age thirteen, and was soon after placed in a juvenile facility pursuant to a Person in Need of Supervision petition, filed by her.  Cruz PSR ¶ 59.  Mr. Cruz spent ages fifteen to seventeen in social service facilities and afterwards moved in with his grandmother in Bedford-Stuyvesant, Brooklyn.  Cruz PSR ¶ 59.

Mr. Cruz possessed a firearm during the robbery.  Cruz PSR ¶ 6.  He has a substantial criminal record, including a conviction for possession of a firearm, and was the oldest of the co-defendants.

Unlike the other defendants, Mr. Cruz was not an alleged member of the Crips, but a member of the Bloods.  At sentencing he admitted a past affiliation, but claimed he no longer was involved with any gang.  This fact highlights the complexity of modern gang membership, especially in or around housing projects, where traditionally the Bloods and Crips have been rivals over turf and drug sales.  *See e.g.,* Andrew Keshner, *Federal prosecutors launch new charges against violent gangs of Long Island*, N.Y. Daily News, Aug. 15, 2017 ("Brooklyn federal prosecutors say seven Bloods members were some of the soldiers in a Roosevelt gang war with their rival Crips. The violence — like three attempted daytime murders on residential streets — stretch from 2008 to 2016, according to authorities.").

Imposition of a lengthy sentence is justified by: (1) the nature of the offense, and Mr. Cruz's possession of a firearm; (2) his criminal background including gun related offenses; (3) his past failure to re-integrate successfully into the community; and (4) the inability of the court to combat the influences of gang culture and poverty which is very likely to result in future criminal activity.

VI.    Conclusion

All relevant issues under the guidelines have been considered; with special attention given to factors listed under 18 U.S.C. 3553(a).

SO ORDERED.


/s/ Jack B. Weinstein
Jack B. Weinstein
Senior United States District Judge


Dated:  December 7, 2017
           Brooklyn, New York